**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| VA 365 LLC, | : | **Civil Action No. 23-2628-AME** |
| | : | |
| Plaintiff, | : | **FINDINGS OF FACT AND** |
| | : | **CONCLUSIONS OF LAW** |
| v. | : | |
| | : | |
| SINE TRADING INTERNATIONAL LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**ESPINOSA, U.S.M.J.**

### I.   INTRODUCTION

On May 15, 2023, Plaintiff VA 365 LLC ("Plaintiff") filed this breach of contract action against Defendant Sine Trading International LLC ("Defendant"), arising out of the alleged breach of a commercial lease. [D.E. 1]. Plaintiff and Defendant consented to the Magistrate Judge's authority to conduct all proceedings, including trial and entry of final judgment, and the District Court accordingly referred the action to this Court, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, by Order entered March 25, 2024. [D.E. 26]. The Court conducted a bench trial on September 23, 2024, during which the parties were afforded a full opportunity to be heard, examine and cross-examine witnesses, present documentary evidence, and argue the law and facts. The parties made closing arguments on October 31, 2024. Having reviewed the evidence, evaluated the witnesses' credibility, and considered the relevant law, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). Based thereon, judgment will be entered for Plaintiff.

II.    FINDINGS OF FACT

A.    The Parties and Their Relationship

1.    Plaintiff and Defendant are citizens of different states. Stip. Fact ¶ 1.[1]

2.    Plaintiff is a New Jersey limited liability company with three members, Hindy Sobel, Bella Steinmetz, and Samuel Graham, all of whom are domiciled in New York. P-l. Fed. R. Civ. P. 7.1(a)(2) Disclosure Statement [D.E. 12].

3.    Defendant is a Pennsylvania limited liability company with a sole member, Wayne Fu, who is domiciled in Pennsylvania. Def. Fed. R. Civ. P. 7.1(a)(2) Disclosure Statement. [D.E. 13].

4.    Plaintiff is the owner and landlord of a property located at 365 Coit Street, in Irvington, New Jersey, which includes a commercial building consisting of approximately 26,340 square feet of gross building area and its outside space (the "Premises"). Stip. Fact ¶¶ 2-3.

5.    Defendant was the tenant of the Premises in accordance with the Lease Agreement effective April 1, 2022, for occupancy of the entire Premises for a term of five years, to be used as a warehouse and storage facility (the "Lease Agreement"). Stip. Fact ¶ 3; P-2.

6.    Plaintiff, as Landlord, executed the Lease Agreement by its principal Hindy Sobel. Tr. 21:7-10; P-2.

7.    Defendant, as Tenant, executed the Lease Agreement by its principal and owner Wayne Fu. Tr. 137:24-138:1; P-2.

---

[1] The parties' Stipulated Facts are listed in the Final Pretrial Order [D.E. 37] and were also read into the record at trial. *See* Trial Transcript (hereinafter "Tr.") 199:10–201:3.

B.    **Terms of the Lease Agreement**

1.  Section 1.02 of the Lease Agreement provides that Plaintiff's delivery of the Premises to Defendant is made in "as is" condition and that Plaintiff makes no warranty with respect to the physical condition of the Premises. P-2.

2.  Sections 3.01, 3.02, and 3.04 of the Lease Agreement sets forth Defendant's rent obligations. The provisions require a monthly minimum rental payment of $18,000 during the first year, with yearly increases thereafter, according to the schedule set forth therein. They also require Defendant to pay for all costs of operation, maintenance, and repair of the Premises, and insurance premiums, taxes, utilities, and other expenses arising in connection with the Lease Agreement, all of which is owed to Plaintiff as "Additional Rent." P-2.

3.  Sections 5.01 and 5.02 of the Lease Agreement provide that Defendant is responsible, at its sole expense, for keeping all portions of the Premises in good repair and in safe and sanitary condition and for making all necessary repairs, including roof and structural repairs. It further provides that Defendant, at its own expense, is obligated to maintain or replace all minor or major components of the Premises' mechanical systems, including plumbing, electrical, and HVAC systems. P-2.

4.  Section 6.01 of the Lease Agreement provides that Defendant is responsible for obtaining all necessary use and occupancy certificates for the Premises. P-2.

5.  Section 9.02 of the Lease Agreement provides that Defendant is responsible for maintaining certain levels of insurance coverage and for providing evidence of such coverage to Plaintiff. P-2.

6.  Section 16.01 of the Lease Agreement lists various occurrences constituting an

3

"Event of Default," a term including the following actions and/or non-actions by

Defendant: (a) vacation or abandonment of the Premises (b) failure to pay any

installment of rent in full when due where such failure continues for five days after

written notice from Plaintiff to Defendant; (b) failure to maintain the required

insurance; (c) violation, failure to perform, or otherwise breaking any covenant or

condition or any obligation to Plaintiff where such violation or noncompliance

continues for twenty days after written notice from Plaintiff to Defendant. P-2.

7.  Section 16.01(B) of the Lease Agreement lists Plaintiff's rights, remedies, and

obligations in an Event of Default, including its right to terminate the Lease

Agreement and right to reenter and take possession of the Premises without

terminating the Lease Agreement. P-2.

8.  Section 16.01(C)(a) of the Lease Agreement provides that, in case of re-entry,

repossession, or termination, Defendant remains liable for all monthly rent due under

the Lease Agreement, and all "Additional Rent" obligations, until the date the Lease

Agreement would have expired had such re-entry, repossession, or termination not

occurred. Defendant also bears all expenses incurred by Plaintiff in re-entering, re-

possessing, and re-letting the Premises. However, the foregoing is subject to an offset

for Plaintiff's net proceeds of any re-letting. P-2.

9.  Section 16.01(C)(a) of the Lease Agreement also provides that, as an additional

remedy for an Event of Default, Plaintiff is entitled to an award of attorneys' fees, as

may be adjudged reasonable by a court, should Plaintiff prevail in a lawsuit filed to

enforce the provisions of the Lease Agreement. P-2.

10. Section 27.01 of the Lease Agreement states that no waiver, change, modification, or

4

discharge of any term of the Lease Agreement shall be effective unless "expressed in writing and signed by both Landlord and Tenant." P-2.

**C.    Performance Under the Lease Agreement**

11. During the trial of this action, the Court heard testimony from five witnesses: Samuel Grunbaum, Akiva Stern, Joseph Halberstam, Wayne Fu, and Louis Lipsky.[2] Among other things, they each testified as to the parties' respective performance and/or failure to perform under the Lease Agreement. By agreement of the parties, the Court also considered as evidence the testimony provided by Jeffrey Barnish and Marcellus Banner at their respective depositions.[3] Additionally, as set forth in the transcript of trial proceedings, the Court admitted various documents into evidence, and those exhibits will be relied on and referenced throughout these Findings of Fact and Conclusions of Law.

12. Samuel Grunbaum is a principal of Plaintiff and of non-party Vanta Developers ("Vanta"), which manages assets owned by its principals, including Plaintiff and the Premises. Tr. 19:22-20:9.

13. Akiva Stern is employed by Vanta as a field manager and in that role performed property management services for the Premises. Tr. 49:1-12.

---

[2] Mr. Lipsky is Plaintiff's legal counsel in this matter. Although he represented Plaintiff throughout the litigation, including at trial, testimony given by Mr. Fu indicated Mr. Lipsky may be a fact witness concerning a critical aspect of Defendant's theory of defense, specifically that Plaintiff and Defendant agreed to termination of the Lease Agreement. Defendant had no objection to Mr. Lipsky's testimony to rebut Mr. Fu's assertion. The Court permitted Mr. Lipsky to testify as to a very narrow scope of questions concerning the purported occurrence of a certain communication between Mr. Fu and Mr. Lipsky, finding that such limited rebuttal testimony did not warrant Mr. Lipsky's disqualification under Rule of Professional Conduct 3.7. Tr. 246:20-23, 249:2-14, 250:19-251:4.

[3] The transcript of Mr. Barnish's deposition is in evidence as P-40, and the transcript of Mr. Banner's deposition is in evidence as D-12.

14. Joseph Halberstam is employed by Vanta as a project manager and in that role collects rents owed by tenants and handles other money-related matters, such as insurance, pertaining to properties managed by Vanta. He served as project manager for the Premises. Tr. 91:4-92:13.

15. Wayne Fu is the sole owner of Defendant and, as of the time of trial, had owned the company for twelve years. He testified that Defendant is a customs broker engaged in providing customs clearing, transportation, and delivery services for incoming freight imported by other companies. Tr. 137:24-138:12.

16. Mr. Fu received his undergraduate degree in materials science in his native country of China. In 1999, he immigrated to the United States, where he earned three masters' degrees in the fields of mechanical engineering, computer science, and business administration. He can read and speak English proficiently and considers himself highly educated. Tr. 139:10-140:23.

17. Mr. Banner was employed by Defendant during the time relevant to this action. He worked on the Premises, and his duties included shipping and receiving of cargo and handling billing and invoices. Banner Dep. Tr. 7:10-8:25, 26:17-22; Tr. 151:1-6.

18. Mr. Stern testified that, before moving into the Premises, Defendant requested Plaintiff make certain repairs or changes to the Premises, including removal of some walls on the first floor, removal of a large safe, installation of electrical wiring for Defendant's forklift, and repair of bathroom fixtures. These contemplated repairs are set forth in the March 9, 2022 letter of intent. Tr. 49:19-50:1; P-41.

19. Mr. Stern further testified that all the requested work was performed. In particular, he stated that all four bathrooms, consisting of two men's rooms and two ladies' rooms

on each floor, were painted and that toilets throughout the building were changed. Plaintiff presented invoices and photographs documenting the repair work recounted in Mr. Stern's testimony 50:8-25, 63:21-23; P-5.

20. Mr. Fu testified that he recalls Defendant moved into the Premises on April 10, 2022. He was present on the Premises for the first two months of Defendant's tenancy, and then hired Marcellus Banner, leaving Mr. Banner to oversee Defendant's operations on the Premises. Tr. 151:23 – 152:1-6.

21. On May 5, 2022, Mr. Fu texted property manager Mr. Stern to report that one toilet in the men's room did not flush. Tr. 60:1-3. 171:11-24; P-6.

22. Mr. Fu testified that, although he sent this text a few weeks after moving in, this was when he first realized that one of the toilets did not flush. He further testified that, in his view, this was a problem that was not fixed prior to Defendant's move-in date, as it should have been. Mr. Fu acknowledged that under the Lease Agreement, any repairs to the Premises are Defendant's responsibility, but he stated it was his understanding that this responsibility took effect only after the Plaintiff made the repairs Defendant required before taking occupancy, according to the parties' letter of intent. Tr. 172:5-173:4, 241:1-15.

23. In May 2022, Mr. Stern offered to assist Defendant with subleasing the second floor of the Premises because, according to Mr. Stern, it was not being used. Mr. Stern testified that, based on his observation of the Premises during Defendant's occupancy, the workload was almost non-existent. Tr. 59:12-14, 67:1–68:10; P-6.

24. Mr. Banner recalled that Mr. Stern paid some visits to the Premises to show it to other potential tenants. However, Mr. Banner also gave conflicting testimony on this

question and admitted during his deposition that he did not have a sharp memory of events that occurred during the time he worked for Defendant. Banner Dep. Tr. 22:15, 22:25-23:1, 40:14-19.

25. Defendant paid the monthly rent due under the Lease Agreement for May through August 2022, making such payments on the following dates: May 9, 2022, June 16, 2022, July 14, 2022, and September 7, 2022. Mr. Fu acknowledged that under the Lease Agreement, the rent payment was due on the first of the month. Tr 152:12-153:7.

26. On August 23, 2022, Plaintiff's project manager Joseph Halberstam emailed Defendant to demand payment of the past-due rent for August 2022. In response, Mr. Fu complained that some of the toilets and urinals on the Premises did not work and asserted they should have been fixed before Defendant's move-in to the Premises. Mr. Fu listed these problems in an August 23, 2022 email to Mr. Halberstam and demanded Plaintiff make the needed repairs. P-15.

27. Mr. Fu testified that he withheld the August 2022 rent to force Plaintiff to fix the plumbing problems on the Premises, asserting Plaintiff should have addressed these issues before Defendant moved in. Tr. 156:21-157:5.

28. Mr. Fu admitted the Lease Agreement did not contain a provision permitting Defendant to withhold rent. He also admitted he did not hire or consider hiring a contractor to perform the bathroom repairs at Defendant's own expense and then seeking to offset those costs against the rent due. Tr. 159:17-160:22.

29. Mr. Grunbaum testified that Defendant's rent payment was habitually late and that, repeatedly, when Defendant was asked for the overdue monthly rent, Mr. Fu claimed

a bathroom on the Premises was not working. Mr. Grunbaum further testified that in or about August 2022, he realized Mr. Fu was using the purported poor condition of a bathroom to avoid paying rent for the Premises. At this point Mr. Grunbaum, on behalf of Plaintiff, authorized Plaintiff's attorney to send Defendant a letter notifying it of several potential Events of Default under the Lease Agreement and demanding the defaults be cured. Tr. 21:25-22:14; P-16.

30. On August 25, 2022, Plaintiff's attorney Mr. Lipsky sent a letter to Mr. Fu, notifying Defendant of various defaults and the consequences of failing to cure them (the "Notice Letter"). It stated, among other things, that Defendant had failed to provide a Certificate of Occupancy and proof of insurance as required by the Lease Agreement and must provide such documents within twenty days of the Notice Letter to avoid an Event of Default. The Notice Letter also acknowledged Mr. Fu's request that Plaintiff repair certain bathroom and plumbing fixtures but reiterated that the Lease Agreement places the sole responsibility for these repairs on Defendant. Finally, the Notice Letter stated that the rent due on August 1, 2022, in the amount of $18,000, had not been paid and expressly notified Defendant that failure to pay the overdue rent within five days would constitute an Event of Default, "providing [Plaintiff] with the remedies contemplated by Section 16.01(B) of the Lease, including, but not limited to, the right to terminate the Lease, accelerate all sums due over the remainder of the Term, and/or apply Eighteen ($18,000.00) Thousand Dollars of the security deposit to the past due rent ...." The Notice Letter concluded by further advising Defendant that it was, for that year, the one and only notice of unpaid rent that Plaintiff was obligated to provide under the Lease Agreement. P-16

9

31. Following email transmission of the Notice Letter from Mr. Lipsky's law office to Mr. Fu, Mr. Lipsky and Mr. Fu engaged in a series of email communications. In that chain of messages, Mr. Lipsky conveyed Plaintiff's offer to make certain repairs to the Premises, including plumbing, as Defendant requested, despite being under no obligation to do so under the Lease Agreement, in return for Defendant's execution of an agreement confirming that, once the requested repairs were made, all other features of the Premises were accepted in "as-is" condition. Mr. Lipsky's emails explained that Plaintiff wished to pursue this deal to ensure the future rental payments under the Lease Agreement would be made without delay or interruption, that is, without being withheld by Defendant. Mr. Fu rejected Plaintiff's proposal to sign the "as-is" agreement, despite Mr. Lipsky's express warning that Defendant's continued withholding of rent would result in a Notice of Event of Default and litigation to enforce Plaintiff's rights, including recovery of accelerated rent payments under Lease Agreement Section 16.02. P-33.

32. Mr. Grunbaum testified that he did not receive any response from Defendant concerning the Notice Letter. He also testified that Mr. Lipksy informed him that negotiations with Mr. Fu were not fruitful. Tr. 22:12-20, 32:2-5.

33. On September 7, 2022, Mr. Halberstam sent Mr. Fu a reminder email, asking for payment of the overdue August rent. Defendant paid the August 2022 rent on September 7, 2022. Tr. 131:5-8, 153:2-7, 167:10-168:17.

34. Defendant did not pay the rent due September 1, 2022 or October 1, 2022, for those respective months. Tr. 133:9-11.

35. Plaintiff determined in or about late August or early September 2022 that it would

10

seek Defendant's eviction from the Premises. Tr. 34:10-18.

36. However, Plaintiff did not immediately pursue efforts to seek Defendant's eviction due to the observance of various Jewish holidays by Plaintiff's principals and agents during the period spanning September to October. Tr. 22:18-23:4, 34:19-35:5, 131:11-132:23.

37. After the religious holidays, Mr. Stern went to the Premises on or about October 20, 2022. Mr. Stern testified that at this visit, he spoke with a person he identified as Defendant's employee, who informed him that Defendant would be moving out at the end of the month. Mr. Stern further testified that he notified Mr. Grunbaum of this information. Tr. 69:7-70:4.

38. Mr. Banner testified he recalled speaking to a Jewish man he believed to be the property manager but whose name he did not know. To the best of Mr. Banner's recollection, this conversation occurred shortly before the move out, in October 2022, when the property manager visited the Premises. According to Mr. Banner's testimony, the property manager stated he and Mr. Fu had agreed to a date for Defendant to leave the Premises. Banner Dep. Tr. 20:20-22:6, 23:6-21, 27:10-28:9.

39. Mr. Banner also testified that he himself did not have any conversations with property management about terminating the Lease Agreement early nor did he hear any conversations between Mr. Fu and property management about moving out of the Premises. Banner Tr. 25:6-26:3

40. According to the testimony of Mr. Stern and Mr. Grunbaum, Plaintiff was not aware of Defendant's intention to vacate the Premises until Mr. Stern's October 20, 2022 visit to Premises. Tr. 22:23-23:4, 38:2-39:11, 69:4-19.

11

41. However, Mr. Fu testified that an agent of Plaintiff had contacted him by telephone, and they discussed the possibility that Defendant could move out at the end of October 2022. According to Mr. Fu, the caller suggested that Defendant's early termination of the Lease Agreement was a viable way forward and something Defendant had not considered before that call. Mr. Fu further testified that, during that phone conversation, the person with whom he spoke authorized Defendant to vacate the Premises and terminate the Lease Agreement as of October 31, 2022. Tr. 179:6-9, 183:19-21, 219:5-23, 221:11-222:11.

42. Mr. Fu also testified that, concerning outstanding rent and rent obligations going forward, he and the caller agreed that Defendant would pay the August 2022 rent, that Defendant's security deposit would be applied to any rent owed for September and October 2022, and that Defendant would otherwise be released from any obligation for further rental payments under the Lease Agreement. Tr. 222:12-224-6.

43. Mr. Fu could not identify the person with whom he spoke during that phone call concerning Defendant's early termination of the Lease Agreement. He stated he could not recall the person's name or whether the caller even provided a name. Mr. Fu confirmed it was not Mr. Stern but asserted it had to be a "decision-maker"—specifically Plaintiff's owner or its attorney—because, Mr. Fu reasoned, only a person with authority could make such a high-level decision over the phone. 183:22-23, 184:25-185:18, 220:9-221:8.

44. Mr. Fu could not recall the exact date of that phone call. He believed it was shortly before September 7, 2022, the date he paid the August 2022 rent, because, during the call, the topic of Defendant's overdue rent came up and Mr. Fu agreed he would

12

make that payment right away. Tr. 183:24-184:4.

45. Mr. Fu testified that he took the phone call from his office in Pittsburgh but could not identify any individual from that office who witnessed the call. Tr. 185:22-196:4.

46. Although he admitted he kept logs of his phone calls and had phone logs for the period during which the alleged telephone call about moving out of the Premises occurred, he testified that going through his phone logs to find a record of this call would be too time consuming. He did not produce a log of the call. Tr.184:15-21.

47. Following the phone call, Mr. Fu did not draft, seek to prepare, or execute any document that would modify and/or terminate the Lease Agreement. Tr. 189:23-25.

48. Mr. Fu did not memorialize the conversation in any written format, including by text message or email to Plaintiff, despite knowing that any changes to the Lease Agreement had to be made in writing. Tr. 187:12-24.

49. Mr. Fu engaged in regular email and text communications with Plaintiff's employees, specifically with Mr. Stern and Mr. Halberstam, throughout Defendant's occupancy of the Premises. Tr. 168:18-169:23; P-9, P-11, P-12, P-13, P-14, P-15.

50. Mr. Fu exchanged emails with Plaintiff's attorney, Mr. Lipsky, in late August 2022, initiated by Mr. Lipsky's email transmission of the Notice Letter. P-33.

51. Mr. Grunbaum denied having any discussions with Mr. Fu concerning Defendant's intent to move out of the Premises. Additionally, when questioned if it was possible that Plaintiff's real estate broker, Lipa Goldman, or one of Plaintiff's employees might have contacted Mr. Fu to arrange an early move out date, Mr. Grunbaum testified that his employees knew he had already involved an attorney in the matter, and they were not to communicate with tenants once legal counsel was involved. Mr.

Grunbaum further stated that, by the time of the phone call Mr. Fu claims he had with an agent of Plaintiff, Plaintiff's counsel had already been asked to reach out to Mr. Fu concerning the various Lease Agreement defaults. Tr. 26:23-27:10, 30:20-32:5, 42:20-43:4.

52. Mr. Stern denied having any conversations or exchanging texts with Mr. Fu between June 15 and October 30, 2022. Tr. 70:9-11.

53. Mr. Halberstam denied having any discussions with Mr. Fu concerning Defendant's intent to move out of the Premises. He testified he was not aware that anyone speaking on behalf of Plaintiff or Vanta had such a discussion. Tr. 104:22-105-3.

54. Mr. Lipsky gave testimony to rebut Mr. Fu's assertion that it may have been Plaintiff's attorney who engaged in the phone conversation purportedly authorizing Defendant to leave the Premises and terminate the Lease Agreement at the end of October 2022. Mr. Lipsky denied having that conversation with Mr. Fu. He further testified it was not possible that Mr. Fu spoke with anyone else from Mr. Lipsky's office, as Mr. Fu identified the caller as male and the only other person in the office familiar with the case was a female attorney. Tr. 252:5-9, 253:3-10.

55. Mr. Fu testified that, at or about this time in 2022, it was difficult to find warehouse space, which he attributed to high demand during the Covid pandemic. He further testified that it took him at least a month, plus a quick negotiation, to find new warehouse space for Defendant to lease. Tr. 190:16, 191:9-24.

56. On October 3, 2022, Defendant entered into an agreement to lease a unit at 94 Ford Road, consisting of 4,710 square feet, for a period of three years commencing on October 20, 2022. The monthly rent for this unit was $5,798.38. Stip. Fact ¶ 11; P-34.

14

57. On October 30 and 31, 2022, Mr. Stern texted Mr. Fu to confirm Defendant was no longer occupying the Premises. Mr. Stern testified he needed this information to know when the building locks could be changed. After this exchange, Mr. Stern had no further communication with Mr. Fu. Tr. 70:18-71-7; P-6.

58. Defendant failed to provide Plaintiff a certificate of occupancy during the term of the Lease Agreement. Stip. Fact ¶ 5; Tr. 199:25-200:2.

59. Defendant failed to provide Plaintiff proof of insurance to Plaintiff during the term of the Lease Agreement. Stip. Fact ¶ 6; Tr. 200:3-4.

60. Defendant vacated the Premises on October 31, 2022. Stip. Fact ¶ 8; Tr. 200:8-9.

**D. Events After October 2022**

61. Plaintiff sought to re-lease the Premises after Defendant moved out, advertising it through commercial real estate broker Lipa Goldman. Tr. 75:11-20; P-1.

62. Plaintiff entered into a lease with non-party Davco Trucking LLC ("Davco"), leasing the Premises effective March 1, 2023, for a term of 62 months (the "Davco Lease"). The monthly rent under the Davco Lease was $18,000 until month 14, with annual increases thereafter. It provided Davco two free months of rent, with payments to begin on May 1, 2023. Stip. Fact ¶ 11; Tr. 200:10-11.

63. The Davco Lease was breached in October 2023. Plaintiff was unable to negotiate a repayment agreement with Davco or work out another arrangement. Tr. 24:8-25:18.

64. Plaintiff obtained a replacement tenant for the Premises in August 2024, when it executed a lease with non-party Top Road-PA Inc. for a term of 60 months, commencing October 1, 2024 (the "Top Road Lease"). The monthly rent under the Top Road Lease was $22,000, with payments to increase according to the schedule

15

set forth therein. Tr. 26:4-22, P-20.

65. After Defendant moved to the Denville site, Mr. Banner, who had worked for
Defendant at the Premises, remained employed by Defendant after the move. Banner
Dep Tr. 27:12-15, 29:12-23.

66. Mr. Banner testified that Defendant handled the same volume of business on the
Denville site as it had at the Premises. Banner Dep. Tr. 29:18-23, 44:1-3.

67. On February 26, 2023, Mr. Fu sent an email to the Denville site's landlord advising
Defendant could no longer make meaningful use of that warehouse facility,
explaining it had only been used a couple of times since Defendant took occupancy.
Mr. Fu asked whether the site could be put on the market. Stip. Fact ¶ 12.

**E.  Evidence of Plaintiff's Claimed Damages**

68. Mr. Halberstam testified at trial concerning spreadsheets he prepared to calculate
Plaintiff's claimed losses resulting from Defendant's alleged breach of the Lease
Agreement. He explained the information set forth in those spreadsheets and the
methodology he used to calculate the losses. The spreadsheets were admitted into
evidence. Tr. 106:12–111:4, 111:17–122:15; P-22, P-23, P-24.

69. Had Defendant remained on the Premises for the entire 60-month term of the Lease
Agreement, Defendant would have paid a total of $1,146,773.40 in monthly rent
through May 2027, when the Lease Agreement was to conclude. Tr. 107:5-13; P-22.

70. Defendant paid a total of $84,000 in monthly rent for the time it occupied the
Premises. This amount represented payments for the months of April 2022 through
August 2022. Tr. 107:6-108:6; P-22.

71. From September 2022 through April 2023, Plaintiff lost the full amount of rent

Defendant was obligated to pay under the Lease Agreement, without offset from amounts received from a new tenant. These losses total $108,540.00. Tr.109:10-110:5; P-22.

72. Late fees for Defendant's failure to pay timely rent from September 2022 through April 2023 total $1,400. Tr. 122:17-24; P-22.

73. After re-leasing the Premises, Plaintiff began receiving rental payments from Davco in May 2023. Davco would have paid a total of $1,146,773.40 for the entire term of the Davco lease, through April 2028. Tr. 108:7-13; P-22.

74. Between May 2023 through September 2023, Plaintiff received rent payments from Davco. However, because the respective rent schedules in the Lease Agreement and the Davco lease were not identically aligned, Plaintiff sustained a loss represented by the difference between the amount paid by Davco and the amount Defendant would have paid under the Lease Agreement. Between May 2023 through May 2027, the difference in Defendant's required rent payment and Davco's required rent payment total $28,239.01. Tr. 108:14-109:9; P-22.

75. Between October 2023, when Davco defaulted on its lease, and October 2024, when new tenant Top Road began making rent payments under its lease, Plaintiff sustained a loss represented by the amount of rent it would have collected from Defendant for these months under the Lease Agreement. These losses total $245,197.64. Tr. 112:1-10; P-23.

76. After Defendant prematurely left the Premises at the end of October 2022, Plaintiff incurred and paid various expenses considered "Additional Rent" under the Lease Agreement. These expenses included property taxes, utilities, insurance, repairs and

maintenance, trash removal, fire alarm, and a management fee. For the period in which the Premises remained vacant, these losses totaled $93,574.23. Tr. 114:7-121:24; P-22.

77. Plaintiff incurred a brokerage fee in connection with listing the Premises for rent after Defendant prematurely left the Premises. The total brokerage fee paid by Plaintiff to Lipa Goldman for listing the property and obtaining Davco as a tenant was $57,338.66. Mr. Halberstam prorated that amount to apply a credit for the 13 months of the Davco Lease that go beyond the term of the Lease Agreement, leaving Defendant responsible for the portion of the fee corresponding to 47 months. That loss amounts to $44,915.20. Tr. 110:11- Tr. 111:4; P-22; P-24.

78. Mr. Halberstam's calculations, including the loss amounts he included in those calculations, were not challenged at trial.

79. In addition to the loss amounts detailed by Mr. Halberstam's testimony and spreadsheets, Plaintiff also seeks an award of reasonable attorneys' fees, under the Lease Agreement's fee shifting provision. As of the time of trial, Plaintiff's attorneys' fees totaled $84,313.75. P-29.

## F. Assessment of the Liability Evidence

80. Mr. Fu was not a credible or reliable witness. His recollection of facts and events relating to the Lease Agreement and this action for breach of contract was inconsistent. Mr. Fu's ability to provide details supporting his defense was superior to his recollection of facts disfavoring his position. Moreover, his testimony was frequently contradicted or called into doubt by other evidence.

81. Of particular importance here, Mr. Fu's testimony that Plaintiff and Defendant

entered into an oral agreement for early termination of the Lease Agreement and a release of Defendant's rent payment obligation thereunder is not credible.

82. Mr. Fu claimed the agreement was reached in a phone call he received from a person purporting to represent Plaintiff's interests. However, although he could remember certain details of the conversation clearly—including a discussion of Defendant's desire to move out of the Premises at the end of October 2022, release from future financial obligations under the Lease Agreement, and the authorization he asserted Plaintiff's representative gave—Mr. Fu could not recall or identify other equally important details, including the name of the individual with whom he spoke or the exact date and time of the phone call.

83. Despite his awareness of the significance of this conversation, Mr. Fu did not thereafter confirm it in writing in any way, either in his own phone log or in a text or email message to a representative or employee of Plaintiff, notwithstanding the fact that Mr. Fu had previously exchanged many written communications concerning the Premises with Plaintiff's representatives, both before inception of the Lease Agreement and during Defendant's occupancy of the Premises thereunder. These communications included Defendant's specific demands for repairs to the Premises and its monthly rent payment. Mr. Fu's failure to make a written record of the phone conversation and the oral agreement purportedly reached thereby further discredits his testimony on the subject of any purported authorization to vacate the Premises and terminate the Lease Agreement.

84. Mr. Fu displayed an understanding of the parties' obligations under the Lease Agreement. He is well-educated, holding several advanced degrees from American

19

universities. In both his testimony and in written documents admitted into evidence, Mr. Fu demonstrated a command of the spoken and written English language.

85. Mr. Fu also expressly admitted he was aware that any and all changes to the terms of the Lease Agreement must be made in writing. Nevertheless, he did not thereafter draft or seek that Plaintiff draft a written agreement, in any format, modifying the Lease Agreement's 60-month term or otherwise relieving Defendant of its various obligations under the Lease Agreement.

86. Mr. Fu's testimony on the subject of the purported lease termination phone call was contradicted by other evidence in the record. For example, the timing of the phone conversation in which Mr. Fu claims to have been authorized to leave the Premises, which he places at immediately before September 7, 2022, does not align with his testimony that from the time he began looking for a new warehouse, it took him at least a month plus a brief negotiation period to obtain a lease. Yet, the parties stipulate to the fact that Defendant executed a lease for the Denville premises on October 3, 2022, less than a month after the purported phone call. This evidence, together with Mr. Fu's testimony, strongly suggests Defendant was looking for new warehouse space before early September 2022, and certainly before any purported oral modification to the Lease Agreement was made. In short, the timeline of events further undermines Mr. Fu's credibility on the subject of the purported lease termination phone call.

87. Additionally, Mr. Fu's credibility was diminished by his testimony on other matters concerning the Lease Agreement. For example, he testified he did not obtain insurance for the Premises because, although he had back-and-forth communications

with an insurance agent, he could not recall whether he received a quote. In fact, an agent quoted a premium of $6,300, which was conveyed to Mr. Fu by email dated May 19, 2022. Mr. Fu chose not to purchase the insurance. Tr. 148:19-149:5, 151:15-22, P-31.

88. Defendant failed to provide any evidence corroborating Mr. Fu's assertion that Plaintiff agreed Defendant could vacate the Premises at the end of October 2022 and was relieved of its obligations under the Lease Agreement. Although Mr. Banner testified that he recalled being told by Mr. Fu, in or about September or October 2022, that Plaintiff authorized Defendant to move out, Mr. Banner did not witness the phone conversation, or even work in the Pittsburgh office where Mr. Fu states he took the phone call, but rather learned of this information solely from Mr. Fu himself.

89. The testimony given by Messrs. Grunbaum, Stern, and Halberstam was credible.

90. In particular, the Court credits their testimony that they did not speak with Mr. Fu to offer and authorize Defendant's early termination of the Lease Agreement and release from future rent payments. Such a conversation is patently inconsistent with the Notice Letter Mr. Grunbaum authorized Plaintiff's attorney to send Defendant, advising of Defendant's various failures to comply with the Lease Agreement, demanding these failures be cured, and providing notice that a failure to cure would trigger an Event of Default and lead to Plaintiff's enforcement of its remedies under the Lease Agreement, which include Plaintiff's right to take possession of the Premises and to recover accelerated rent payments. It is also inconsistent with Mr. Grunbaum's testimony that Plaintiff had already determined, in early September 2022, that it would initiate eviction proceedings against Defendant and, in connection

21

with that plan, had involved Plaintiff's attorney in matters concerning non-compliance with the Lease Agreement.

91. The Court also credits Mr. Lipsky's testimony denying he placed a call to Mr. Fu authorizing early termination of the Lease Agreement. Mr. Lipsky is an officer of the Court and has given no indication that his sworn testimony was untruthful or unreliable. In contrast, Mr. Fu's assertion that the caller could have been Mr. Lipsky was purely speculative.

92. The evidence presented at trial establishes that Defendant failed to pay the rent due for September 2022 and October 2022, failed to obtain a certificate of occupancy and/or insurance for the Premises, and abandoned the Premises at the end of October 2022, prior to the conclusion of the Lease Agreement's 60-month term, without Plaintiff's authorization and agreement.

### III.   CONCLUSIONS OF LAW

93. The Complaint filed by Plaintiff asserts one claim against Defendant for breach of contract. The Court exercises diversity jurisdiction over this action, and thus under the doctrine of *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), New Jersey law applies to Plaintiff's contract claim. *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 182 (3d Cir. 2017).

94. To prevail on its breach of contract claim under New Jersey law, Plaintiff must establish, by a preponderance of the evidence, that:  (1) a valid contract existed between the parties; (2) Defendant breached that contract; (3) Plaintiff performed its obligations under the contract; and (4) Plaintiff sustained damages as a result of the breach. *Bonnieview Homeowners Ass'n v. Woodmont Builders, LLC*, 655 F. Supp. 2d

473, 509 (D.N.J. 2009) (citing *Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002)).

95. The Court finds that, by a preponderance of the evidence, Plaintiff has proven each of those four elements.

96. Plaintiff established the Lease Agreement is a valid contract between Plaintiff and Defendant.

97. Plaintiff established that Defendant breached the Lease Agreement in various ways: First, Plaintiff proved that Defendant abandoned the Premises in or about October 2022, without written agreement by and between the parties, in violation of Lease Agreement Section 16.01(A)(a). Second, Plaintiff proved that Defendant failed to pay monthly rent due and owing for September 2022 and October 2022, in violation of Lease Agreement Section 16.01(A)(b). Third, Plaintiff proved that Defendant failed to maintain and provide proof of insurance, as required by Section 9.02, in violation of Lease Agreement Section 16.01(A)(c). Fourth, Plaintiff proved that Defendant failed to provide a Certificate of Occupancy, as required by Section 6.01(c), in violation of Lease Agreement Section 16.01(A)(e).

98. Plaintiff established that it performed its obligations under the Lease Agreement. Plaintiff proved that, as required under Lease Agreement Section 1.01, it let, gave access and right of occupancy, and delivered to Defendant the Premises, as described in the Lease Agreement. Moreover, Plaintiff proved that, as required under Lease Agreement Section 1.02, it delivered the Premises to Defendant in its condition as of the effective date of the Lease Agreement, in other words, in "as is" condition.

99. Plaintiff established that it sustained damages as a result of Defendant's breach of

contract. Plaintiff's losses, based on the evidence presented at trial and on the provisions of the Lease Agreement, are as follows:

a.  Under Lease Agreement Section 16.01(C)(a), Plaintiff is entitled to the remedy of an accelerated payment of all monthly rent for the balance of the 60-month term according to the schedule of payments set forth in Section 3.01, less an offset for rent paid by a new tenant during such time. The amount of accelerated monthly rent owed by Defendant, less rent paid by subsequent tenant Davco and rent expected to be paid by subsequent tenant Top Road, is $381,976.65.

b.  Under Lease Agreement Section 16.01(C)(a), Plaintiff is entitled to recover for various expenses that would have otherwise been paid as "Additional Rent" by Defendant under Sections 3.02 and 5.01. The amount of these "Additional Rent" expenses is $93,574.23.

c.  Under Lease Agreement Section 3.03, Plaintiff is entitled to recover late fees for missed and/or untimely rent payments between September 2022 and April 2023. The amount of these fees is $1,400.

d.  Under Lease Agreement Section 16.01(C)(a), Plaintiff is entitled to recover brokerage fees it paid to obtain a replacement tenant through the end of the term of the Lease Agreement. The brokerage fee amount is $44,915.20.

100.  In total, Plaintiff is entitled to $521,866.08 in damages as a result of the breach of contract.

101.  In addition to the foregoing damages for breach of contract, under Lease Agreement Section 16.01(C)(a), Plaintiff is entitled as the prevailing party in this

action to an award of reasonable attorneys' fees incurred in enforcing its contractual rights. Accordingly, the Court will direct Plaintiff to file a motion for attorneys' fees, supported by an attorney declaration, invoices, and a brief addressing the reasonableness of the fees sought, according to a lodestar calculation.

## IV.    CONCLUSION

For the reasons stated above, judgment will be entered against Defendant in the amount of $521,866.08, plus reasonable attorneys' fees and costs. A Final Order and Judgment will be entered.

Dated: April 28, 2025

       /s/ *André M. Espinosa*
      ANDRÉ M. ESPINOSA
      United States Magistrate Judge